NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0293n.06

Case No. 25-1337

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 08, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
|  | ) |  |
| WILLIE DAVID LARK, | ) |  |
| Defendant-Appellant. | ) | O P I N I O N |

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

McKEAGUE, Circuit Judge. Before taking his case to trial, Willie Lark moved to suppress evidence, asked for a *Franks* hearing, and sought dismissal of his indictment under the Speedy Trial Act. The district court denied all three requests, and a jury found Lark guilty of drug trafficking. Seeing no error in the district court's decisions, we **AFFIRM.**

**I.**

Willie Lark twice sold drugs to a confidential informant in Benton Harbor, Michigan. That prompted Detective Jeremiah Gauthier to seek a warrant to track the vehicle Lark drove to both transactions.

The supporting details were provided in an accompanying affidavit. Gauthier first articulated his own decade-long experience as a drug investigator. Then he explained that Informant 1 tipped off police that he or she could purchase cocaine from Lark. Gauthier described

Informant 1 as "credible and reliable" because Informant 1 had provided "verified" drug related tips to Gauthier and his colleagues for nearly a year and engaged in multiple controlled substance purchases during that time. R. 40-2, PageID 133, ¶¶ C, E. So, two controlled buys were arranged between Lark and the informant. Both proceeded in much the same way: Gauthier searched Informant 1 for contraband; Informant 1 met with Lark, purchased cocaine using recorded funds, and then was surveilled while returning to Gauthier. And there was another commonality too: Lark arrived to both transactions in the same red pickup truck. Presented with that information, a state court judge authorized police to place a tracking device on the red pickup truck for 45 days.

Several months later, Gauthier sought permission to track the red pickup truck again. This time, in the supporting affidavit, Gauthier relayed the same details about his experience and the initial controlled buys between Lark and Informant 1. But Gauthier also included new evidence. Among other things, he relied on another confidential informant—Informant 2—who had fed "verified or corroborated" drug information to Gauthier's colleagues for 10 months. *Id.*, PageID 140, ¶ M. Informant 2 claimed that Lark repeatedly delivered heroin to his or her home, each time using a red pickup truck. And, as it turned out, data from the initial tracking warrant showed that the red pickup truck had made numerous trips to the area near Informant 2's residence.

But there was more. Tracking data also showed that the red pickup made stops at several locations Gauthier "previously identified as being involved in drug trafficking." *Id.*, ¶ J. Indeed, on several occasions, Gauthier personally observed Lark—and the red pickup truck—at a residence on McAllister Avenue pegged by Informant 2 as a location from which Lark sold drugs. During that surveillance, Gauthier watched several individuals arrive at the property (some of whom interacted briefly with Lark) and then quickly depart. To Gauthier's eye, those short visits were consistent with drug activity. And he made similar observations at Lark's residence on South

Fair Avenue during a short period of surveillance. That made the red pickup truck's presence at both locations significant because, in Gauthier's experience, vehicles are often used to facilitate criminal activity. Based on those ties between the red pickup truck and drug sales, a state court judge authorized police to track the vehicle again.

As the investigation progressed, Gauthier sought a third warrant, this time to search Lark's South Fair Avenue residence. Once again, the accompanying affidavit detailed Gauthier's law enforcement experience and described the first controlled buy between Lark and Informant 1. And it rehashed Gauthier's surveillance efforts and the information gleaned from tracking the red pickup truck.

But it added detail on several fronts. One example: Gauthier now explained that he drove Informant 1 to the South Fair Avenue residence before the second controlled buy and claimed that the deal began in the driveway, where Lark arrived in his red pickup truck. But no drugs changed hands at that spot because Lark needed to refresh his supply. It was only a short time later, after Informant 1 called Lark, that an intermediary at a different location turned over cocaine. Another example: Gauthier provided more specifics about the drug deliveries to Informant 2,[1] explaining that tracking data showed the red pickup truck's stops at Informant 2's residence were "typically shorter stays ranging from two minutes to ten minutes" and frequently began and ended from South Fair Avenue, often with no detours. R. 40-1, PageID 107, ¶¶ R-S.

---

[1] This informant goes by different names, called "CI-2" in the second vehicle affidavit but relabeled "CI-3" in the residence affidavit. That's because the residence affidavit includes information from an additional, chronologically intervening informant. To the extent Lark takes issue with that relabeling, he offers no evidence to suggest the confidential informant called "CI-2" in the second vehicle affidavit is different than "CI-3" in the residence affidavit. To be as clear as possible, we simply refer to this individual as Informant 2 throughout. And we use the moniker Informant 3 for the other, intervening informant.

And the affidavit offered new details too. To start, it described Lark's past run in with the law, a charge of felony delivery of a controlled substance. And it included information from fresh confidential informants. One, who we will call Informant 3, had been working with Gauthier and his team for about half a year, providing reliable drug tips. Like the others, Informant 3 explained that Lark was a Benton Harbor-based drug dealer. Another—Informant 4—had a multi-year track record of providing reliable drug tips. Informant 4 personally observed methamphetamine, heroin, fentanyl, and cocaine at the South Fair Avenue residence, and told police that Lark sold drugs out of that location. And Informant 4 backed that tip up by purchasing heroin from Lark at the South Fair Avenue residence just days before Gauthier sought the warrant.

Presented with all that information, a state court judge authorized a search of the South Fair Avenue property. And that search turned up methamphetamine, fentanyl, and cocaine, along with Lark's parole paperwork, his social security card, and birth certificate. So a grand jury indicted Lark with two counts of possessing with intent to distribute controlled substances.

Before trial, Lark filed various motions. He moved to suppress any evidence obtained by tracking his vehicle or through the search of his residence. He also sought a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), pointing to alleged inconsistencies in the warrant affidavits. And finally, he moved to dismiss the indictment on Speedy Trial Act grounds. The district court denied each motion. So, Lark took the case to trial and was convicted. After being sentenced to 360 months' imprisonment, Lark appealed.

## II.

Lark challenges his convictions on three fronts. Each comes up short.

**A.**

First, Lark argues that none of the warrants were supported by probable cause. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. And when officers secure a warrant to conduct a search, it must be backed by probable cause. *See id.* Whether probable cause exists is a "practical, common-sense" question: "given all the circumstances set forth in the affidavit" is there "a fair probability that contraband or evidence of a crime will be found in a particular place[?]" *United States v. White*, 990 F.3d 488, 490 (6th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "With great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021). Here, both the vehicle tracking warrants and the residence search warrant clear that minimal hurdle.

**1.**

Up first are the vehicle tracking warrants. Probable cause to place a tracking device on a vehicle exists "if a supporting affidavit establishes probable cause to believe that the device will uncover evidence, fruits, or instrumentalities of a crime." *United States v. Coleman*, 923 F.3d 450, 454 (6th Cir. 2019). The affidavits here do just that.

Start with the first tracking affidavit. It focused on Informant 1, who participated in two controlled buys with Lark. And Lark arrived to both those transactions in the same red pickup truck. From that information alone, it would have been easy for the state court judge to conclude that tracking the red pickup truck "could uncover further evidence of wrongdoing." *Id.*; *United States v. Easter*, No. 25-1248, 2026 WL 18812, at *2 (6th Cir. Jan. 2, 2026). Indeed, "[c]ourts

have upheld vehicle-tracking warrants based on much weaker factual allegations than these." *See Coleman*, 923 F.3d at 454.

The second tracking affidavit included all that information and more. It relayed the tip provided by Informant 2, who claimed Lark repeatedly delivered drugs to his or her residence— each time driving a red pickup truck. And tracking data gleaned from the first tracking warrant showed the red pickup truck had in fact made numerous trips to the area near where Informant 2 lived. Adding to that, Gauthier witnessed the target vehicle parked at locations where Gauthier observed behavior he associated with drug activity. Paired with that information, the presence of the red pickup truck was noteworthy because, by Gauthier's estimation, it was likely being used to help facilitate drug offenses. Piling that information on, the second tracking affidavit clears the probable cause hurdle as well.

**2.**

The same is true of the warrant to search the South Fair Avenue residence. On this score, the focus is "whether officers provided direct or circumstantial support to create more than mere suspicion that contraband will be found at the location in question." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (en banc) (citation modified). Said differently, the affidavit must demonstrate "a nexus between the place to be searched and the evidence sought." *United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019) (citation modified).

Begin with Informant 4, a credible informant who told officers that he had seen "quantities of crystal methamphetamine, cocaine, and heroin/fentanyl" at the South Fair Avenue residence "currently and in the past." R. 40-1, PageID 107, ¶ T. With that tip, the affidavit "identifie[d] a reliable informant and establishe[d] that informant's basis for knowledge that drugs . . . [would] be found at the residence in question." *Untied States v. Moore*, 661 F.3d 309, 312 (6th Cir. 2011).

But it didn't stop there. Informant 4 purchased heroin from Lark at the South Fair Avenue property just three days before Gauthier sought a warrant. That transaction directly linked the South Fair Avenue residence to illicit drug sales. *See, e.g.*, *United States v. Archibald*, 685 F.3d 553, 558 (6th Cir. 2012). And there is more still. The second controlled buy between Lark and Informant 1 began in the driveway on South Fair Avenue. Recall too that Lark was accused of delivering drugs to Informant 2's home, and tracking data showed that most of those deliveries started or ended at the South Fair Avenue address. Beyond that, Gauthier observed activity at the residence that, based on his experience, was indicative of drug sales. And on top of all that, even if insufficient standing alone, the affidavit explained that Lark lived at the South Fair Avenue residence and had a past conviction for felony-controlled substance delivery. *See United Staes v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) ("Although a defendant's criminal history is not dispositive, it is relevant to the probable cause inquiry." (citation modified)). Putting all those facts together, the state court judge very reasonably found a fair probability of criminal activity at the South Fair Avenue residence.[2]

**3.**

Lark's counterarguments don't change things. To start, he thinks the information in the residence search warrant was stale. But even if some of the information was dated, Informant 4 purchased drugs from Lark at the South Fair Avenue residence just 72 hours before Gauthier sought the warrant. And it "is reasonable that three days after [a] drug purchase[,] police would find narcotics . . . in the residence." *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003). Lark also points out that Informant 4 does not say where on the property the drugs changed hands.

---

[2] Lark cites *United States v. Westley*, No. 22-3356, 2023 WL 5377894 (6th Cir. 2023) in his reply brief, claiming that the majority in that case "found that it could not connect the dots in the affidavit to find a substantial nexus" on similar facts. Appellant's Reply Br. at 14. But the panel in that case was fractured, and on the probable cause issue the majority concluded the affidavit *was* sufficient. *Westley*, 2023 WL 5377894, at *11-12.

Yet that detail does not alter the probable cause calculus because "direct evidence, such as a credible informant's tip of criminal activity occurring in or directly outside of the location of the search" can demonstrate "a fair probability that contraband will be found at the place to be searched." *Sanders*, 106 F.4th at 462. So, neither of Lark's specific doubts about the residence affidavit move the probable-cause needle.

Nor do Lark's more general attacks. To start, Lark accuses the district court of improperly cross-referencing the affidavits. Yet there is no indication it did so in assessing probable cause. As we explain below, it only compared the affidavits in assessing Lark's *Franks* argument.

Lark also repeatedly questions the reliability of the confidential informants. He thinks the affidavits' attempts to vouch for their veracity were "too general" and lacked "specifics." Appellant's Br. at 21. For one, that overlooks the cumulative impact of not one, not two, not three, but four informants providing consistent information. *See Crawford*, 943 F.3d at 307. For another, where an officer has worked with a confidential informant, or another officer vouches for an informant's credibility, that is generally sufficient to demonstrate reliability. *See id.* at 306. Indeed, an "affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001).

The affidavits here did just that. They established that Gauthier, or one of his drug taskforce colleagues, worked with the informants for an extended period of time, and that each had previously provided reliable tips (and only reliable tips) to drug investigators. *See, e.g.*, *United States v. Allen*, 211 F.3d 970, 971, 975 (6th Cir. 2000) (en banc) (finding sufficient a statement that informant was "a responsible and credible citizen because, [the affiant had] known said informant for 5 years and said informant [had] given [the affiant] information about individuals involved in criminal activity in the past that [had] proven to be reliable" (citation modified)). It is

true, of course, that the informants remained unnamed in the affidavits, but that is not fatal to a credibility finding. *See United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006). Based on their track records, there was little reason to doubt the reliability of the informants' tips that Lark was dealing drugs and using his red pickup truck and South Fair Avenue residence to do so.

But even if there were reasons to doubt their reliability, independent information augmented the informants' credibility. *See Dyer*, 580 F.3d at 392. Tracking data drawn from the first warrant, for example, confirmed that Lark's red pickup truck had driven to the area near where Informant 2 claimed Lark delivered drugs. And both Informant 1 and Informant 4 engaged in controlled buys with Lark. Piecing that all together, to our eye, the informants appear "quite credible" because they were both "known to the officers" and their tips were "proven right." *Sanders*, 106 F.4th at 464.

Lark also takes issue with the way the controlled buys were conducted, pointing out that the affidavits do not say whether each buy was fully surveilled or if officers saw drugs change hands between Lark and the informants. Those are fair critiques, but on these facts, they don't change the result. To start, a holistic reading of the affidavits suggests that each transaction was surveilled to some degree, even if that detail is not explicitly mentioned each time a buy is described. And, even if that were not the case, Gauthier vouched for the prior credibility of the informants participating in the buys and the affidavits show that officers took some steps to oversee each transaction. *See, e.g.*, *Crawford*, 943 F.3d at 303 (relying on controlled buy in a probable cause assessment even though officers could not "monitor [the informant's] interaction with [the defendant]" because the reliable informant was able to "fill[] in the gaps"); *see also United States v. Mitchell*, No. 21-5571, 2021 WL 5772534, at *4–5 (6th Cir. Dec. 6, 2021) (similar). Even if the affidavits could have been more detailed on this front, assessing the controlled buys along with all

the other facts offered by Gauthier, there was a fair probability Lark's pickup truck and residence were connected to drug activity.

Beyond that, Lark's arguments pick the affidavits apart with "line-by-line scrutiny"—an "improper" "divide-and-conquer approach." *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc) (citation modified). Again and again, he highlights apparent weakness in the information Gauthier provided, focusing on what more the affidavits could have included. But a warrant affidavit is assessed based on "what it does contain, not on what it lacks, or on what a critic might say should have been added." *Allen*, 211 F.3d at 975. And, as we've already described, Gauthier offered plenty. Viewed through the proper deferential lens, there was enough evidence to find probable cause to support each warrant. So, the district court correctly denied Lark's suppression motion.

**B.**

Next, Lark argues that the district court should have held a *Franks* hearing so that he could question Gauthier about alleged misleading statements or omissions in the warrant affidavits. *Franks v. Delaware*, 438 U.S. 154 (1978). But to be entitled to a *Franks* hearing, a defendant "must make a substantial preliminary showing that the affidavit includes a knowing, intentional, or reckless falsehood" and that "the affidavit couldn't have established probable cause without such falsehoods." *United States v. Richards*, 164 F.4th 508, 519 (6th Cir. 2026) (citation modified). That presents a heavy burden because we presume warrant affidavits are valid. *Id*. And the decision "to hold an evidentiary hearing based upon a challenge to the validity of a search warrant's affidavit, given alleged misstatements and omissions, is committed to the sound discretion of the district court." *United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017).

Measured by those standards, the district court properly refused Lark a *Franks* hearing. Start with Lark's assertion that Gauthier's statements must be false because the description of the second controlled buy between Informant 1 and Lark differs from affidavit to affidavit. No doubt, the affidavits explain in varying degrees of detail how the buy between Informant 1 and Lark took place. Even so, while the affidavits "contain *different* details, they are not *contradictory* details." R. 64, PageID 302 (emphasis in original).

A look at the affidavits confirms as much. Gauthier explained in the vehicle affidavits that Informant 1 purchased cocaine from Lark during the second controlled buy, and that Lark drove the red pickup truck to the transaction. The subsequent residence affidavit does not walk that assertion back—it simply explains how the drugs were delivered through an intermediary after Informant 1 initiated the deal with Lark in the driveway of the South Fair Avenue residence. That difference in detail makes sense, given the focus of each warrant. And it makes this case different from a case like *United States v. Hammond*, 351 F.3d 765 (6th Cir. 2003), where "remarkable inaccuracies" tainted the affidavit. *Id.* at 774. In the end, Lark offers no evidence to show that the second controlled buy did not unfold as Gauthier consistently described—albeit in varying levels of detail—and so he falls short of identifying false statements necessary to trigger a *Franks* hearing. *See Franks*, 438 U.S. at 155–56.

Perhaps recognizing that shortcoming, Lark shifts gears and claims that, at the very least, Gauthier omitted details from the vehicle tracking affidavits. But, on that score, he faces a steep climb because "a defendant . . . trying to show an omission . . . must meet an even higher standard: that the officer omitted the information with an intention to mislead and that the omission was critical to the finding of probable cause." *United States v. Higgins*, 141 F.4th 811, 817 (6th Cir. 2025) (citation modified), *cert. denied*, 223 L. Ed. 2d 540 (2026). Lark musters hardly more than

a conclusory assertion that Gauthier intended to mislead the state court judge by offering a shorter description of the controlled buy in the vehicle affidavits. Because Lark "can't show that [Gauthier] was lying by not including [more] information," his argument comes up short. *Richards*, 164 F.4th at 519 (citation modified).

Lark also focuses on Gauthier's statements about when the second tracking device was placed. In doing, he points to data from the tracker showing that it was active the day before Gauthier claimed it was affixed to the red pickup truck. From that, Lark infers that Gauthier's statement about when the tracker was placed must be false. But Lark has not explained why Gauthier's statement was untrue. Indeed, as the government persuasively explains, the tracker likely logged activity before being positioned because it was being charged, not because it was already logging the movements of the truck. Lark does little to refute that plausible explanation, certainly less than the required "substantial" showing. *Franks*, 438 U.S. at 155. More important, though, even if Gauthier misspoke about the date the tracker was placed, Lark offers no evidence that he did so recklessly or intentionally, nor does he explain how excising that data would materially affect the probable cause calculus. *Id*. at 155–56.

Finally, Lark protests that the district court improperly cross-referenced the vehicle affidavits with the residence affidavit. But it did so only to determine if the documents included contradictory information, which might have allowed Lark to shoulder his initial *Franks* burden. Indeed, in moving for a *Franks* hearing, Lark offered up that exact type of analysis. And he does not hesitate to rely on cases employing a similar framework. *See United States v. McMurtrey*, 704 F.3d 502, 512 (7th Cir. 2013) (concluding that *Franks* hearing was necessary when a "side-by-side" comparison of affidavits revealed "contradictions"). All told, the district court properly declined to hold a *Franks* hearing.

**C.**

Finally, Lark argues that he was not brought to trial fast enough. The Speedy Trial Act requires trials to begin no later than 70 days after the defendant's indictment or initial appearance in court. 18 U.S.C. § 3161(c)(1). But the Act includes various exclusions, so not all days are included in that count. *See id.* § 3161(h)(1)-(8). For today's purposes, it suffices to address just one.[3]

18 U.S.C § 3161(h)(7)(A) affords district courts discretion to delay a trial and omit time from the speedy trial calculation when "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *See Zedner v. United States*, 547 U.S. 489, 498 (2006). As the parties see it, the district court exercised that ends-of-justice authority in awaiting our en banc decision in *United States v. Sanders* before ruling on Lark's motion to suppress. And, as we understand his brief, Lark doesn't suggest that a specific, forthcoming decision likely to provide guidance about a central issue is an improper reason to delay a defendant's trial. At the very least, he cites no authority for that proposition, so we need not dwell on that point.

Instead, Lark says, the district court's explanation came too late. To his mind, the district court's reliance on *Sanders* was simply an "after-the-fact" excuse to grant a continuance and its

---

[3] Lark, though, faces other problems. 18 U.S.C. § 3161(h)(1)(D), for example, excludes the time between the filing of a motion and a hearing on that motion from the speedy trial clock. *See United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988). As the district court saw it, that meant the time it needed to decide whether a hearing on Lark's *Franks* motion was necessary was excluded. Yet, in Lark's opening brief, beyond a few passing references, he develops little argument challenging that conclusion. By simply "mention[ing]" that argument "in a skeletal way" and "leaving the court to put flesh on its bones," Lark arguably waived the issue. *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) (citation modified). And that's a problem because we have "repeatedly held that a litigant's failure to address every independent ground on which the district court rests its decision renders the judgment unreviewable." *United States v. Perry*, No. 22-2031, 2024 WL 692890, at *8 (6th Cir. Feb. 20, 2024).

"retrospective explanation" failed to "meet the Speedy Trial Act's requirements." Appellant's Br. at 50-53. So, according to Lark, far more than 70 days ticked off the clock.

No doubt, the Act requires a district court to "set[] forth, in the record of the case, either orally or in writing, its reasons" for granting a continuance. 18 U.S.C. § 3161(h)(7)(A). But "the court does not have to give its reasons contemporaneously with the grant of the continuance; it need only give the reasons no later than the ruling on the defendant's motion to dismiss on Speedy Trial Act grounds." *United States v. Richardson*, 681 F.3d 736, 739 (6th Cir. 2012) (citation modified); *Zedner*, 547 U.S. at 507. And we do not require a district court to use "magic words" in intoning an ends-of-justice finding. *United States v. White*, 920 F.3d 1109, 1117 (6th Cir. 2019) (citation modified). Accordingly, an ends-of-justice continuance is appropriate where "the reasons for it are clear from the context or record." *Id.*

Here, the context makes clear that from the get-go the district court thought the ends of justice were best served by awaiting our decision in *Sanders*. Start with the initial hearing on Lark's suppression motion, where *Sanders* was the first agenda item the district court addressed. During the hearing, the district court explained that the *Sanders* en banc argument had been scheduled for later that year, for what that was "worth," R. 57, PageID 247-48, and it later continued Lark's trial "pending resolution of [his] motion to suppress." R. 55, PageID 206. Consistent with its initial focus, the district court later explained that *Sanders* was worth a fair bit. To its mind, the parties were best served by awaiting en banc guidance because "the original panel decision in *Sanders* is probably one of the strongest Lark [could] cite for his position." R. 64, PageID 295 n.1; R. 67, PageID 307-08. And it stayed steady in denying Lark's motion to dismiss on speedy trial grounds, explaining that the *Sanders* en banc "decision [had] the potential to reshape the proper analysis of Lark's nexus challenge." R. 70, PageID 328-29.

With all that, the district court put its finding on the record, and it did so "by the time [it] rule[d] on [the] defendant's motion to dismiss." *Zedner*, 547 U.S. at 507. The district court's order denying Lark's motion to dismiss, true enough, is not couched explicitly in ends-of-justice terms. But it cited its § 3161(h)(7)(A) authority. And an "ends-of-justice continuance can be found even when a delay is not designated as such by the court." *White*, 920 F.3d at 1117 (citation modified). Nor is there any indication that the district court conjured up *Sanders* as an after-the-fact reason to sidestep the Speedy Trial Act's dictates. *Cf., e.g.*, *United States v. Brown*, 100 F.4th 703, 713 (6th Cir. 2024) ("[T]the district court's retrospective explanation for its ends-of-justice continuance did not meet the Speedy Trial Act's requirement that it explain, on the record, why the ends of justice served by the continuance outweigh the public's and defendant's interests in a speedy trial."). On this record—where the importance of *Sanders* was evident from the start—we are convinced that "[p]hony, post-hoc justifications played no role." *United States v. Patton*, 651 F. App'x 423, 426 (6th Cir. 2016). And with that waiting period excluded, Lark's prosecution fell within the required Speedy Trial Act window.

## III.

For those reasons, we **AFFIRM** the district court's judgment.